UNITED STATES DISTRICT COURT
<u>NORTHERN DISTRICT OF NEW YORK</u>

FREDERICK "HANK" ROBAR,

                  Plaintiff,

     -against-                            8:20-CV-0972 (LEK/DJS)

VILLAGE OF POTSDAM
BOARD OF TRUSTEES, *et al.*,

                  Defendants.

---

<u>**MEMORANDUM-DECISION AND ORDER**</u>

## I.    INTRODUCTION

Plaintiff Frederick "Hank" Robar brings this action for declaratory, injunctive, and monetary relief against the Village of Potsdam Board of Trustees (the "Board"), Potsdam Mayor and Board member Ron J. Tischler, Potsdam Deputy Mayor and Board member Steven Warr, Potsdam Code Enforcement Officer Lisa Newby, and Potsdam Administrator Gregory L. Thompson, asserting claims under the First and Fourteenth Amendments to the United States Constitution and the Visual Artist Rights Act, 17 U.S.C. § 706A ("VARA"). Dkt. No. 1 ("Complaint"). Before the Court is Plaintiff's motion for a temporary restraining order and preliminary injunction, Dkt. No. 5 ("Motion"), which is accompanied by a memorandum of law, Dkt. No. 5-1 ("Plaintiff's Memorandum of Law"), an affidavit of Plaintiff, Dkt. No. 5-2 ("Robar Affidavit"), a declaration of Plaintiff's attorney Jon E. Crain, Dkt. No. 5-14 ("Crain Declaration"), and various exhibits, Dkt. Nos. 5-3 to -13. As relevant to the Motion, Plaintiff, who has placed toilets repurposed as flower planters in outdoor spaces on several properties he owns in Potsdam, seeks to enjoin an enforcement action against him pursuant to a Potsdam

1

ordinance mandating the removal of "junk," as defined in the ordinance, from public view. See generally Motion. Plaintiff also requests a declaration that his porcelain gardens are not "junk," as defined in the ordinance, and thus are not subject to removal under local law. Pl.'s Mem. of Law at 22. Defendants have submitted a response in opposition to the Motion, Dkt. No. 13 ("Response"), accompanied by a memorandum of law, Dkt. No. 13-1 ("Defendants' Memorandum of Law"). Plaintiff filed a reply. Dkt. No. 18 ("Reply").

Upon the consent of the parties, the Court decides Plaintiff's motion for a temporary restraining order and motion for a preliminary injunction simultaneously. See Dkt. Nos. 15, 16. For the reasons that follow, the Court grants Plaintiffs' Motion and denies Plaintiff's request for declaratory relief.

## II.    BACKGROUND

### A.  Plaintiff and His "Porcelain Gardens"

Plaintiff is a Potsdam resident and property owner who has achieved some renown for what some regard as toilet art. See Compl. ¶¶ 13–29; Robar Aff. ¶¶ 2–3, 12–13. Plaintiff has installed toilets repurposed as planters containing floral arrangements and attached to decorative posts, installations he refers to as "porcelain gardens," on seven properties he owns in Potsdam. See Compl. ¶¶ 17–24; Robar Aff. ¶ 8. To create a "porcelain garden," Plaintiff cleans the bowl, removes the functional components of the toilet, and places an arrangement of flowers in the bowl, "with colorful painted posts and other accompanying plant arrangements." Compl. ¶ 23.

Plaintiff first created these installations to protest a 2005 decision by the Potsdam government denying a special use permit for two adjacent properties he owns, a decision that thwarted Plaintiff's sale of this real estate to a buyer who wished to construct and operate a

Dunkin' Donuts franchise. Compl. ¶¶ 13–29; Robar Aff. ¶¶ 4–8. Plaintiff installed his earliest porcelain gardens on the properties in question as an expression of his philosophical disagreement with Potsdam's purported authority to limit his right to use his private property however he pleased. Compl. ¶ 18; Robar Aff. ¶ 10.

Since that time, the function of Plaintiff's porcelain gardens has evolved to encompass what Plaintiff describes as artistic ends. Compl. ¶¶ 19–20; Robar Aff. ¶¶ 10–11. After his initial protest received praise from local residents, Plaintiff "fell in love with the artistic and expressive value of the toilets as fun and funky porcelain planters." Compl. ¶ 20; Robar Aff. ¶ 10.

Also since his initial 2005 protest, Plaintiff's porcelain garden installations have proliferated across all seven of his properties and achieved local, statewide, and even national attention. See id. ¶ 25, 28; Pl.'s Mem. of Law at 4–6; Robar Aff. ¶ 12; Mot. Ex. A. For instance, News outlets covering Upstate New York news, including the *Watertown Daily Times*, *North Country Now*, and the *Daily Courier Observer,* have published stories discussing Plaintiff's porcelain gardens and describing them as forms of "art"; and Plaintiff's installations have been covered by the *National Broadcasting Company*. Pl.'s Mem. of Law at 4–6. Moreover, Plaintiff "recently entered into a licensing and royalty agreement with an established documentarian, authorizing the production of a short film" featuring his porcelain gardens. Compl. ¶ 28.

Plaintiff's installation of numerous repurposed toilets across his several Potsdam properties has at times led the Potsdam government to initiate legal action against him. From 2008 to 2010, the Potsdam Code Enforcement Officer[1] issued various citations with respect to

---

[1] Plaintiff does not specify whether Defendant Newby or a different person held that title at that time.

Plaintiff's properties and on two occasions compelled him to appear before the Village Court.
Compl. ¶¶ 30–40; Robar Aff. ¶ 14. In 2008, the Code Enforcement Officer issued two "Order[s]
to Remedy Violation[s]" for one of his properties, one on April 3, 2008 and one on September 4,
2008, both alleging that Plaintiff's porcelain gardens violated Chapter 142-11 of the Village
Zoning Code.[2] Compl. ¶¶ 31–32; Robar Aff. ¶ 14(a)–(b). Subsequently, the Code Enforcement
Officer issued an "appearance ticket" on September 12, 2008, requiring Plaintiff to appear before
the Village Court on September 24, 2008. Compl. ¶ 33; Robar Aff. ¶ 14(c). The matter was
ultimately dismissed. Compl. ¶ 34; Robar Aff. ¶ 14(c). During the end of 2009 and the beginning
of 2010, a similar process unfolded with respect to the same property, with the Code
Enforcement Officer issuing an "Order to Remedy Violation," the same authority subsequently
issuing an "appearance ticket," and the matter ultimately being dismissed. Compl. ¶¶ 35–37;
Robar Aff. ¶ 14(d)–(e).

### B.  Village Code Chapter 125

On December 3, 2018, the Board adopted a "Junk Storage Law," incorporated at Chapter
125 of the Village Code. Compl. ¶ 42; Robar Aff. ¶ 15; Mot. Ex. G.[3] The law provides that "[t]he
deposit, accumulation, display and/or outdoor storage of junk, junk appliances, junk furniture,
junk mobile homes, junk motor vehicles, garbage (collectively hereinafter ('junk')), regardless of
quantity, is hereby prohibited within sight of persons traveling the public highways or within
sight of neighboring property/properties and/or business concerns." Village Code § 125-5. The

---

[2]  This provision predates and is unrelated to the restrictions in Chapter 125.

[3]  The Village had attempted to adopt a "Junk Storage Law" in 2010 but never filed the
law with the New York Department of State, as required. See Compl. ¶ 42.

law defines "junk" as "[w]orn out or discarded material of little or no value, including, but not

limited to, junk appliances, junk furniture, junk mobile home(s), junk motor vehicle(s) and/or

garbage and/or rubbish, clutter, litter and debris." Id. § 125-4. "Junk appliances" is defined to

include "bathroom fixtures," id., which in turn is defined as "[a]ny fixture reasonably found in a

bathroom, including, but not limited to, *toilets and toilet components*, sinks and sink

components, vanities and vanity components, medicine cabinets, mirrors, bathtubs and shower

stalls," id. (emphasis added). In its "Statement of Purpose" section, the law provides that its

restrictions are intended to serve aesthetic and public safety objectives, in addition to preventing

property values from declining:

> The outdoor storage of junk on privately owned property within the
> Village of Potsdam is detrimental to the health, safety and general
> welfare of the community. Junk storage constitutes an attractive
> nuisance to children and may imperil their safety. The presence of
> junk is unsightly and tends to depreciate the value not only of the
> property on which such junk is located but also the property of other
> persons and/or entities within the neighborhood thereof (and the
> community in general) unless such junk is properly removed or
> screened from public view. Control of the outdoor storage of junk on
> privately owned properties within the Village of Potsdam is therefore
> regulated for the preservation of the health, safety and general welfare
> of the community . . .

Id. § 125-2.

Violations of Chapter 125 are punishable by fine. The ordinance provides that "[a]

violation of the provisions of this chapter shall be punishable by a minimum fine of $250 and

maximum fine of $500 for each offense and shall be levied by a court of competent jurisdiction,"

and that "[e]ach day that a violation of this chapter is committed or continues to exist shall

constitute a separate offense." Id. § 125-8A.

The issuance of a "notice to comply" is a prerequisite to the enforcement of the statute in

any individual case. "Whenever a violation of [Chapter 125] is found to exist within the Village of Potsdam, either the Village Code Enforcement Officer, the Village police or other duly designated agent of the Village shall give a written notice to comply to the owner and/or occupant" of the offending property. Id. § 125-7C. The notice to comply must contain certain information, such as the location of the allegedly offending property, the name of its owner, a statement of the alleged facts upon which a violation is based, and a demand that the relevant "junk" be "removed or placed so as to be in compliance with this chapter within 30 days after the service or mailing of the notice." Id. § 125-7E.

A Potsdam resident served with a Notice to Comply can request a hearing with the Board. "If a public hearing is requested, in writing, by the person charged with a violation of this chapter . . . a hearing shall be held by the Board of Trustees at the call of the Mayor, but in no case later than 30 days after receipt by the Village Clerk of the written request." Id. § 125-9. At this hearing, the Board will hear testimony from the property owner, the "charging officer or agent," and any members of the public affected by the alleged violation. Id. § 125-10. In reaching a decision, the Board must consider the following factors: (A) "The amount or size of the junk"; (B) "The physical composition of the junk"; (C) "The proximity of the junk to neighboring property lines and public view"; (D) "The presence and quality of any screening between the junk and public or private view"; (E) "The presence and quality of any screening between the junk and the offending property owner and/or occupant who caused it"; (F) "The presence of a countervailing legitimate purpose or utility for the junk"; and (G) "The presence or absence of malice or retaliatory motivation on the part of the offender." Id.

6

**C.  Enforcement of Chapter 125 Against Plaintiff**

The Board ultimately concluded that Plaintiff's porcelain gardens are "junk" within the meaning of the statute and ordered their removal. On December 12, 2019, Thompson notified Plaintiff by letter that all seven of his properties were "in violation of Chapter 125 due to the presence of toilets" and advised Plaintiff, "[p]lease bring your property into compliance with Chapter 125 by removing the toilets." See Mot. Ex. H at 3. On June 5, 2020, Newby served upon Plaintiff seven Notices to Comply, one for each of his properties. See Mot. Ex. I ("Notices to Comply"). By letter on June 10, Plaintiff requested a hearing with respect to each of the seven Notices to Comply, pursuant to Village Code § 125-9. See Mot. Ex. J ("Request for Hearing"). The Board held a hearing on June 29, 2020. Compl. ¶ 53; Robar Aff. ¶ 19. On July 20, 2020, the Board adopted a resolution determining that each of Plaintiff's seven properties was in violation of Chapter 125 and "direct[ing] the removal of all the toilets on all the properties at issue on or before September 1, 2020." See Mot. Ex. K ("Board Resolution") at 4. The Board Resolution further provided that "[i]f the toilets are not fully and completely removed from all the properties at issue the Villages Trustees reserves the right to direct entry by the Village upon all the properties at issue to effect the removal and/or abatement at the expense of" Plaintiff. Id.[4]

**D.  Plaintiff's Motion and Defendants' Response**

*1. Plaintiff's Motion*

On August 28, 2020, Plaintiff filed the present Motion. Docket. Plaintiff seeks to enjoin Defendants from removing his porcelain gardens from his properties pursuant to the Board

---

[4]  Notwithstanding the Board's insistence on a September 1, 2020 deadline, Defendants have consented to suspend Plaintiff's deadline to comply pending the Court's decision on Plaintiff's Motion. See Dkt. No. 11.

Resolution. Pl.'s Mem. of Law at 2.

He characterizes the porcelain gardens as both political speech and artistic expression, and argues that the enforcement of Chapter 125 against him violates the First Amendment. Id. at 9–12. Plaintiff specifies that this is an "as-applied," and not a facial constitutional challenge. Id. at 13 n.1. He argues that, in application to him, the ordinance is a content-based regulation subject to strict scrutiny and, in the alternative, that the law in application fails to satisfy the constitutional requirements for content-neutral regulations. Id. at 12–19.

Plaintiff additionally argues that the enforcement of the ordinance against him violates the Equal Protection Clause of the Fourteenth Amendment. Id. at 23. He maintains that other residents who display repurposed junk in public view on private property have not been subject to enforcement actions under Chapter 125, and that Defendants are selectively enforcing Chapter 125 against him due to the message and content of his art. Id.

Plaintiff's request for injunctive relief is also premised on an argument that this enforcement action violates VARA. Id. at 19–22. He argues that his porcelain gardens are "sculptures, existing in a single copy," 17 U.S.C. § 101, and artistic works of "recognized stature," id. § 706A(d)(3), and are thus protected under the statute from destruction. Pl.'s Mem. of Law at 20–21.

In addition to seeking injunctive relief, Plaintiff also requests a declaration that his porcelain gardens are not "junk," as defined in Village Code § 125-4. Pl.'s Mem. of Law at 22.

*2. Defendants' Response*

Defendants oppose Plaintiff's request for injunctive relief. See generally Defs.' Mem. of Law. Defendants argue that mandating the concealment of Plaintiff's porcelain gardens from

8

public view during the pendency of this lawsuit does not amount to an irreparable harm and that

the instant enforcement action is a reasonable, content-neutral regulation that comports with the

First Amendment. Id. at 4–11. Regarding Plaintiff's Equal Protection claim, Defendants argue

that Plaintiff has failed to present any evidence that similarly situated Potsdam residents have

escaped the enforcement of Chapter 125. Id. at 11–13. Defendants argue further that Plaintiff's

porcelain gardens are exempted from VARA's protections. Id. at 13–17.

With respect to Plaintiff's request for declaratory relief, Defendants argue that Plaintiff's

porcelain gardens satisfy the statutory definition of "junk." Id. at 18–19.

## III.   LEGAL STANDARDS

To obtain a preliminary injunction, "a plaintiff must demonstrate (1) irreparable injury

. . . (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions on the

merits," Fair Hous. in Huntington Comm. v. Town of Huntington, 316 F.3d 357, 365 (2d Cir.

2003) (internal quotation marks omitted), (3) "public interest weighing in favor of granting the

injunction," Yang v. Kosinski, 960 F.3d 119, 127 (2d. Cir. 2020), and (4) that "the balance of

equities tips in his [or her] favor," id. (alteration in original). "When a plaintiff seeks an

injunction staying governmental action 'taken in the public interest pursuant to a statutory or

regulatory scheme,' . . . an injunction will issue only if the plaintiff can show irreparable injury

and meet 'the more rigorous likelihood-of-success standard.'" Fair Hous. in Huntington Comm.,

316 F.3d at 365 (quoting Bery v. City of New York, 97 F.3d 689, 694 (2d Cir. 1996)). When the

movant seeks not a prohibitory "stay," but a "mandatory" order—that is, if the injunction would

"alter the status quo by commanding some positive act"—the standard is even higher; the movant

must demonstrate a "'clear' or 'substantial' likelihood of success on the merits." Mastrovincenzo

v. City of New York, 435 F. 3d 78, 89 (2d Cir. 2006) (quoting No Spray Coalition, Inc. v. City of New York, 252 F.3d 148, 150 (2d Cir. 2001)).

Upon the parties' consent, the Court adjudicates Plaintiff's motions for a temporary restraining order and preliminary injunction simultaneously. See, e.g., Hedges v. Obama, No. 12-CV-331, 2012 WL 1721124, at *1 (S.D.N.Y. May 16, 2012) (converting a motion for a temporary restraining order into a motion for a preliminary injunction during a conference with the court).

## IV.    DISCUSSION

### A.  Standing

Constitutional standing requires: (1) that an injury be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) that there be "a causal connection between the injury and the conduct complained of"; and (3) that it be "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61 (1992) (internal quotation marks and citations omitted).

Defendants do not argue that Plaintiff lacks standing. See generally Defs.' Mem. of Law. And given that the Board has issued a decision mandating the removal of Plaintiff's porcelain gardens from his property, accompanied by an impending date by which removal must occur, there is no question that Plaintiff has "an actual and well-founded fear that the law will be enforced against" him, Vt. Right to Life Comm. v. Sorrell, 221 F.3d 376, 382 (2d Cir. 2000), and that enjoining enforcement is the only way to prevent this imminent injury. Plaintiff has, thus, established standing.

10

**B. Preliminary Injunction**

*1. Irreparable Harm*

"Violations of the First Amendment are presumed irreparable." <u>Tunick v. Safir</u>, 209 F.3d 67, 70 (2d Cir. 2000). The Supreme Court has declared that "the loss of First Amendment freedoms, for even minimal periods of time, constitutes irreparable injury." <u>Elrod v. Burns</u>, 427 U.S. 347, 373 (1976); <u>see also</u> <u>Bery</u>, 97 F.3d at 693 ("Violations of First Amendment rights are commonly considered irreparable injuries for the purposes of a preliminary injunction."); <u>Mitchell v. Cuomo</u>, 748 F.2d 804, 806 (2d Cir. 1984) (noting that "[w]hen an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary," and collecting cases).

Here, "the very nature of [Plaintiff's] allegations" establishes irreparable injury. <u>Bery</u>, 97 F.3d at 694. Since Plaintiff alleges that the enforcement of Chapter 125 would abridge his First Amendment right to freedom of speech, "the dispute on the preliminary injunction motion is whether Plaintiff can satisfy the second prong o[f] the preliminary injunction standard," namely, his likelihood of success on the merits. <u>Burritt v. New York State Dep't of Transp.</u>, No. 08-CV-605, 2008 WL 5377752, at *1 (N.D.N.Y. Dec. 18, 2008).

Defendants counter that the Board does not necessarily mandate the destruction of Plaintiff's porcelain gardens, but rather only their removal from public view, and that Plaintiff thus does not face irreparable harm. Defs.' Mem. of Law at 5–6. But even assuming for the sake of argument that this interpretation of the Board Resolution is correct, Plaintiff still establishes irreparable injury. If it is true, as Plaintiff argues, that the forced removal of his porcelain gardens from public view, and not just their destruction, violates the First Amendment, <u>see, e.g.</u>, Mot. at

11

1–2 (seeking to enjoin Defendants from "forcibly modifying, *removing*, or destroying [Plaintiff's] long-standing artistic installations") (emphasis added), then requiring Plaintiff to relocate or somehow conceal the porcelain gardens pending the outcome of a trial on the merits would amount to a "loss of First Amendment freedoms" for that time, see Elrod, 427 U.S. at 373. Accordingly, Plaintiff has established irreparable harm.

### 2. Likelihood of Success—First Amendment Claim

Because Plaintiff seeks to stay "government action taken in the public interest pursuant to a statutory or regulatory scheme," and because he seeks a "prohibitory" rather than "mandatory" stay, the "likelihood of success on the merits" standard applies—nothing less and nothing more. See Mastrovincenzo, 435 F.3d at 89.

Plaintiff seeks a prohibitory injunction. He seeks not to command that Defendants commit some positive act, but rather to prevent them from enforcing Chapter 125 against him. See id. at 90 (finding that a requested injunction preventing the enforcement of a street vending licensing scheme against certain art vendors was prohibitory, because the injunction would preserve rather than alter the status quo). Plaintiff thus is not subject to the heightened "'clear' or 'substantial' likelihood of success on the merits" standard. Id. (quoting No Spray Coalition, Inc., 252 F.3d at 150).

And because Plaintiff seeks to enjoin the enforcement of a statutory or regulatory scheme, the "likelihood of success on the merits" standard applies, rather than the more lax "serious questions" standard. See Bery, 97 F.3d at 694 (applying the higher "likelihood of success on the merits" standard to a motion to enjoin enforcement of city regulation prohibiting unlicensed public exhibits of visual art). The former standard is appropriate because "there are public

interest concerns on both sides." See Time Warner Cable v. Bloomberg L.P., 118 F.3d 917, 923

(2d Cir. 1997). Namely, Defendants seek to advance the objectives of public safety and

aesthetics, and to prevent the depreciation of the value of neighboring properties, while Plaintiff

seeks to exercise constitutionally protected liberties.

### a. Applicable First Amendment Standards

#### i. First Amendment Protections for Artistic Expression

As a general matter, artistic expression is entitled to First Amendment protection. See,

e.g., Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc., 515 U.S. 557,

569 (1995) (remarking that examples of painting, music, and poetry are "unquestionably

shielded"); Ward v. Rock Against Racism, 491 U.S. 781, 790 (1989) ("Music, as a form of

expression and communication, is protected under the First Amendment"); Schad v. Mount

Ephraim, 452 U.S. 61, 65 (1981) ("Entertainment, as well as political and ideological speech, is

protected; motion pictures, programs broadcast by radio and television, and live entertainment,

such as musical and dramatic works, fall within the First Amendment guarantee"); Kaplan v.

California, 413 U.S. 115, 119–20 (1973) ("Pictures, films, paintings, drawings, and engravings . .

. have First Amendment protection"). "The constitutional protection of artistic works turns not on

the political significance that may be attributable to such productions, though they may indeed

comment on the political, but simply on their expressive character, which falls within a spectrum

of protected 'speech' extending outward from the core of overtly political declarations." Nat'l

Endowment for the Arts v. Finley, 524 U.S. 569, 602–03 (1998). Moreover, "a narrow,

succinctly articulable message is not a condition of constitutional protection, which if confined to

expressions conveying a 'particularized message,' would never reach the unquestionably shielded

painting of Jackson Pollock, music of Arnold Schoenberg, or Jabberwocky verse of Lewis Carroll." Hurley, 515 U.S. at 569 (quoting Spence v. Washington, 418 U.S. 405, 411 (1974) (per curiam)).

At the same time, the Supreme Court has cautioned that "[i]t is possible to find some kernel of expression in almost every activity a person undertakes," City of Dallas v. Stanglin, 490 U.S. 19, 25 (1989), and that the First Amendment protects only "conduct that is inherently expressive." Rumsfeld v. Forum for Academic & Inst'l Rights, Inc., 547 U.S. 47, 66 (2006); United States v. O'Brien, 391 U.S. 367, 376 (1998) ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea.").

The Second Circuit awards four traditional categories of visual art—specifically paintings, photographs, prints, and sculptures—the full and unquestioned protection of the First Amendment, as these forms of art are inherently expressive. See Bery, 97 F.3d at 695. In Bery, the Second Circuit held that "visual art is as wide ranging in its depiction of ideas, concepts and emotions as any book, treatise, pamphlet or other writing, and is similarly entitled to full First Amendment protection." Id.

But in assessing a First Amendment challenge by a purported artist, a court still "must determine what constitutes expression within the ambit of the First Amendment and what does not." Bery, 97 F.3d at 696. In borderline cases, outside of the four traditional categories of visual art mentioned in Bery, the Second Circuit has instructed courts to ascertain whether a work is "predominantly expressive." See Mastrovincenzo, 435 F.3d at 91.

14

*ii. Content-Based Versus Content-Neutral Regulations*

Once some activity is deemed expressive, the logical next step in assessing a First

Amendment challenge to a municipal ordinance that restricts that activity is to determine whether

the ordinance is content-based or content-neutral, because this categorization determines the

applicable level of scrutiny. See City of Ladue v. Gilleo, 512 U.S. 43, 59 (1994) (O'Connor, J.,

concurring) (noting that "[t]he normal inquiry that our doctrine dictates is, first, to determine

whether a regulation is content based or content neutral, and then, based on the answer to that

question, to apply the proper level of scrutiny," and collecting cases).

Content-based regulations are subject to strict scrutiny, while content-neutral regulations

are subject to intermediate scrutiny. Time Warner Cable Inc. v. FCC, 729 F.3d 137, 155 (2d Cir.

2013).  "A content- or speaker-based restriction on protected speech is subject to strict scrutiny

and will be tolerated only upon a showing that it is narrowly tailored to a compelling government

interest." Id. "On the other hand, a regulation of protected speech that is content neutral and that

does not disfavor certain speakers is reviewed under the less-stringent intermediate level of

scrutiny." Id.

But the "intermediate" level of review to which content-neutral regulations are subject,

while less exacting than strict scrutiny, is more than a mere formality. The Supreme Court "long

has recognized that by limiting the availability of particular means of communication,

content-neutral restrictions can significantly impair the ability of individuals to communicate

their views to others. . . . To ensure 'the widest possible dissemination of information[,]' and the

'unfettered interchange of ideas,' the first amendment prohibits not only content-based

restrictions that censor particular points of view, but also content-neutral restrictions that unduly

15

constrict the opportunities for free expression." City of Ladue, 512 U.S. at 55 n.13 (quoting

Geoffrey R. Stone, *Content-Neutral Restrictions*, 54 U. Chi. L. Rev. 46, 57–58 (1987);

Associated Press v. United States, 326 U.S. 1, 20 (1945); and Roth v. United States, 354 U.S.

476, 484 (1957)).

A municipality may issue reasonable regulations governing the time, place, or manner of

speech, without running afoul of the First Amendment, Ward, 491 U.S. at 802–03, "so long as

. . . they are content neutral, narrowly tailored to serve a significant governmental interest, [and]

leave open ample alternatives for communication[.]" Lusk v. Vill. of Cold Spring, 475 F.3d 480,

493 (2d Cir. 2007) (internal quotation marks and alterations omitted). These requirements are

conjunctive, and the failure to meet any one of them violates the First Amendment. See Kuba v.

1-A Agr. Ass'n, 387 F.3d 850, 858 (9th Cir. 2004) ("The failure to satisfy any single prong of

this test invalidates the [law].").

### b.  Are the Porcelain Gardens Protected Artistic Expression?

Defendants do not address the question of whether Plaintiff's porcelain gardens constitute

protected artistic expression for First Amendment purposes, which suggests that Defendants

concede this point. See generally Defs.' Mem. of Law.[5] Nevertheless, for the sake of

thoroughness, the Court addresses this issue here. In addressing this question, there are two

potentially applicable lines of precedent—one devoted to distinguishing expressive conduct from

---

[5]  Defendants do, however, insinuate that the porcelain gardens are not art, in contexts
other than their First Amendment analysis. See, e.g., id. at 7 (stating, in narrating the origins of
the porcelain gardens, that "even though Plaintiff did not consider himself an artist or his
displays to be works of art when first contrived, he contends that the support of the public made
him recognize that the 'toilet bowl gardens' were indeed a form of 'artistic expression'"); id. at
19 (stating, in arguing against the propriety of the requested declaratory relief, that "Plaintiff's
'porcelain planters' are nothing more than common, 'everyday' toilets and urinals").

non-expressive conduct, and one examining the distinction between artistic items and non-artistic items. Because this case arguably occupies a unique space at the intersection of these two doctrinal areas, the Court applies both sets of principles.

A series of three Supreme Court cases provide the fundamental principles for determining whether conduct is sufficiently expressive to merit First Amendment protection. In Spence v. Washington, a student displayed an upside-down United States flag with a peace symbol attached, in violation of a state statute prohibiting the placement of any "mark, picture, design, [or] drawing" on an American flag. 418 U.S. at 406–07. The Supreme Court held that the display was entitled to First Amendment protection, because the act of displaying the altered flag evinced "[a]n intent to convey a particularized message," namely criticism of U.S. domestic and foreign policy, and because "in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it." Id. at 410–11.

In Texas v. Johnson, a demonstrator was prosecuted under a state anti-flag-burning statute after he set the American flag on fire outside the Republican National Convention. 491 U.S. 397, 399 (1989). The Court, interpreting Spence to establish a two-part test requiring both "an intent to convey a particularized message" and a "great" "likelihood . . . that the message would be understood by those who viewed it," id. at 404, held that the conduct at issue was protected, because the "overtly political nature of th[e] conduct was both intentional and overwhelmingly apparent," id. at 406.

But six years later, the Supreme Court issued a decision that is in apparent tension with Spence and Johnson. In Hurely v. Irish-American Gay, Lesbian & Bisexual Group of Boston, in which the Court considered whether the St. Patrick's Day parade was symbolic speech deserving

17

of First Amendment protection, the Court concluded that "a narrow, succinctly articulable message is not a condition of constitutional protection, which if confined to expressions conveying a 'particularized message,' would never reach the unquestionable shielded painting of Jackson Pollock, music of Arnold Schöenberg, or Jabberwocky verse of Lewis Carroll." 515 U.S. at 569 (internal citation omitted). This list of illustrative examples can fairly be interpreted to suggest that, to the extent that an act or work must convey a message, it need not be a political one. See White v. City of Sparks, 500 F.3d 953, 956 (9th Cir. 2007) (noting, in analyzing Hurley, that a painting "may express a clear social position, as with Picasso's condemnation of the horrors of war in Guernica, or may express the artist's vision of movement and color, as with 'the unquestionably shielded painting of Jackson Pollock.' . . . So long as it is an artist's self-expression, a painting will be protected under the First Amendment.") (quoting Hurley, 515 U.S. at 569); see also Nat'l Endowment for the Arts, 524 U.S. at 602–03 ("The constitutional protection of artistic works turns not on the political significance that may be attributable to such productions . . . but simply on their expressive character[.]").

The Second Circuit has "interpreted Hurley to leave intact the Supreme Court's test for expressive conduct in Texas v. Johnson." Church of Am. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 205 (2d Cir. 2004).[6] The Second Circuit has declared that "[t]o be sufficiently imbued with communicative elements, an activity need not necessarily embody 'a narrow, succinctly articulable message,' but the reviewing court must find, at the very least, an intent to convey a 'particularized message' along with a great likelihood that the message will be

---

[6] Some other circuits have reached different conclusions. See Cressman v. Thompson, 798 F.3d 938, 954–56 (10th Cir. 2015) (collecting authorities from the Third, Sixth, and Eleventh Circuits).

understood by those viewing it." Zalewska v. County of Sullivan, 316 F.3d 314, 319 (2d Cir. 2003) (internal citations omitted).

Running parallel to the Spence-Johnson-Hurley line of cases are a pair of cases from the Second Circuit, Bery and Mastrovincenzo, addressing the distinction between artistic and non-artistic objects. In both cases, the Second Circuit was primarily concerned with distinguishing items with expressive content from items with primarily utilitarian purposes, in the commercial context of street vending. In Bery, street vendors of visual art sought to enjoin the enforcement of an ordinance requiring a license for the sale of all non-food goods, including art, anywhere on public property in New York City. 97 F.3d at 692. In granting the preliminary injunction, the Second Circuit at once clarified that the First Amendment categorically protects visual art, as inherently expressive, and noted that there may be borderline cases in which courts must make case-by-case determinations as to whether a visual display is expressive and thus within the purview of the First Amendment. Id. at 695–96. The Court distinguished the "paintings, photographs, prints and sculptures" sold by the plaintiffs, which "always communicate some idea or concept to those who view it" and as such are presumptively and categorically "entitled to full First Amendment protection," from "the crafts of the jeweler, the potter and the silversmith," whose works "may at times have expressive content." Id. at 696.

In Mastrovincenzo, which involved a challenge to the same ordinance, this time by street vendors who sold clothing painted with customized graffiti, the Second Circuit left Bery intact, but refined the principles it established for adjudicating borderline cases of visual displays. See 435 F.3d at 93–97. The Second Circuit in Mastrovincenzo held that, for an item to qualify as expressive, it must have a "predominantly expressive purpose." Id. at 96. The Court essentially

19

deferred to district courts in establishing more particular considerations relevant to determining whether an expressive or non-expressive purpose is dominant in any particular case. See id. at 95–96 ("[W]e have confidence that district courts will prove capable of making such determinations in much the same way that we distinguished between categories of goods in Bery, and in the way that courts have dealt on a case-by-case basis with difficult line-drawing problems in other First Amendment contexts.").

The Court in Mastrovincenzo explicitly declined to apply the doctrine of expressive conduct from the Spence-Johnson-Hurley line of cases. The court presented the "predominantly expressive purpose" test as an alternative one applicable to objects, as opposed to conduct:

> We need not apply the doctrine of expressive conduct here because plaintiffs' conduct—namely, the sale and dissemination of their artistic objects—does not itself contain any expressive content. That is, plaintiffs' claims to First Amendment protection are not predicated on the theory that the act of distributing their artistic objects itself conveys a separate "particularized message" likely to be understood by an audience. Rather, plaintiffs assert that by disseminating to the public objects that they have invested with meaning through their artistry they are communicating directly through those objects—in short, that they are engaging in protected speech.

Mastrovincenzo, 435 F.3d at 91 n.9.

Since the present case involves a situation not precisely analogous to the street vending context, leaving some uncertainty about which test to apply, the Court assesses the porcelain gardens under both the Supreme Court's standards for expressive conduct and the Second Circuit's standards for artistic objects. And in a sense, both tests are applicable: Plaintiff's displaying the porcelain gardens on his property is an action that could be expressive, and the porcelain gardens themselves are potentially artistic items. Viewed through both lenses,

20

Plaintiff's porcelain garden display is entitled to First Amendment protection.

It is undisputed that at least part of Plaintiff's intention in displaying the porcelain gardens is to communicate a political message. As Plaintiff states in his supporting affidavit, and as Defendants concede, one of the purposes of this display from its inception has been to recount the tale of Plaintiff's legal dispute with the Potsdam government over his purported right to convert the property to a commercial use, to memorialize Plaintiff's defeat, and to protest his purported persecution on philosophical grounds. See Robar Aff. ¶¶ 4–10; Defs.' Mem. of Law at 7 ("Plaintiff . . . admits that these first porcelain planters were installed as a political protest against the Village and its refusal to allow Mr. Robar to use his private property as he wished.") (internal quotation marks omitted). This is a particularized message that falls within the genre of political speech. See, e.g., White, 500 F.3d at 956 (noting that art can, at times, express a "clear social position"); Joseph Burstyn, Inc. v. Wilson, 343 U.S. 495, 501 (1952) (noting that art "may affect public attitudes and behavior in a variety of ways," including by "direct espousal of a political or social doctrine"). Moreover, the message evidently has been heard loud and clear by observers, as indicated by various articles and letters to the editor published in local newspapers between 2005 and the present describing Plaintiff's art as a form of political protest. See generally Mot. Ex. A.[7]

---

[7]   The Court relies on these news articles not for the truth of the views their authors express, but merely to establish the existence of observers of Plaintiff's toilet installations who hold these views. See, e.g., Hesse v. Godiva Chocolatier, Inc., No. 19-CV-972, 2020 WL 2793014, at *3 (S.D.N.Y. May 29, 2020) ("Courts have . . . taken judicial notice of materials in the public record, such as . . . newspaper articles . . . for the limited purpose of noting what the documents state, rather than to prove the truth of their contents.") (internal quotation marks omitted); In re Alstom SA Sec. Litig., 406 F. Supp. 2d 402, 408–09 (S.D.N.Y. 2005) ("The Court reviews the newspaper articles submitted by the Defendants . . . not for the truth of the matters asserted therein, but rather merely to note and acknowledge that the existence of those documents

Plaintiff also states that he intends to convey non-political, artistic messages. Namely, his porcelain gardens are meant to communicate "that beauty can be found in the simplest and strangest items" and to express the "fun, bright, and unique character of [his] hometown and community." Robar Aff. ¶ 10. Defendants appear skeptical of these assertions, although they do not dispute them. Defs.' Mem. of Law at 7 (remarking that "even though Plaintiff did not consider himself an artist or his displays to be works of art when first contrived, he contends that the support of the public made him recognize that the 'toilet bowl gardens' were indeed a form of 'artistic expression'"). But this insinuated skepticism of Plaintiff's sincerity is undermined by the fact that observers appear to perceive Plaintiff's artistic messages. See, e.g., Mot. Ex. A at 2 (newspaper columnist remarking that "if we are going to indeed make the big-box plunge with the addition of Wal-Mart to this beautiful village, what better way to ward off a case of the 'now-we're-like-every-other-small-town-in-America' blues than with a bunch of absurd creations by an eccentric local? We must be proud of our local color so that we may stay unique as a town!"); id. at 23 (reader stating in a letter to a local newspaper noting Robar's "creative use of the toilets as flower planters instead of clogging up our landfills . . . at least they brighten up the landscape");

---

and what they contain about relevant matters at relevant times may serve other legitimate purposes in the Court's consideration of the motions before it."); Condit v. Dunne, 317 F. Supp. 2d 344, 358 (S.D.N.Y. 2004) ("The Court does not look to the substance of the articles to resolve any disputed issue on defendant's motion, but does consider the fact of the publication of these articles as evidence of the media frenzy, and thus takes judicial notice of the widespread publicity. . . ."); *News media*, 8 Cyc. of Federal Proc. § 26:293 (3d ed.) ("Generally, courts may take judicial notice of a newspaper article's existence and the fact that press coverage contained certain information, so long as they do not rely on the truth of that information.") (citing New Jersey Carpenters Health Fund v. Royal Bank of Scotland Group, PLC, 709 F.3d 109 (2d Cir. 2013); Rivas v. Fischer, 687 F.3d 514 (2d Cir. 2012)).

id. (another reader of the paper remarking that Robar's display reflects the Potsdam's character as "a town full of artists, musicians, different cultures, etc."); id. at 24 (a third reader stating "Many thanks to Hank Robar for making his property a great piece of art").[8] Thus, Plaintiff's assertion that he seeks to communicate artistic messages appears to be more than a mere contrivance for purposes of this litigation; rather, there is evidently a "great" "likelihood . . . that the message[s] would be understood by those who viewed [them]." Johnson, 491 U.S. at 404. Such genuine artistic messages, even if devoid of political content, are protected by the First Amendment. Cf. White, 500 F.3d at 956 (noting that a painting may constitute protected expression when it expresses "the artist's vision of movement and color" as opposed to "a clear social position").

The Court now turns to the related inquiry of whether the porcelain gardens are "predominantly expressive." Undoubtedly, as Defendants insist, Plaintiff's porcelain gardens are partly junk (in the everyday, not just the statutory sense); but this purpose of Plaintiff's toilets appears to be secondary to their expressive purpose. Plaintiff's dominant intent to convey a message is indicated both by the toilets' incorporation into a larger design and by the display's longevity. As described in Plaintiff's affidavit and shown in the photograph of the porcelain gardens attached to Plaintiff's Motion, the toilets in question have been altered through the removal of their functional components, filled with dirt and flowers, tied to ornately decorated posts, and placed in rows. See Pl.'s Mem. of Law at 8. The toilets are thus transformed and integrally incorporated into a design with multiple parts; they are not left in an haphazard pile, in the manner of garbage. In an analogous way, the intent to communicate a message is what

---

[8] The Court takes judicial notice of these newspaper articles and letters to the editor. See supra note 7.

distinguishes the "unquestionably shielded" paintings of Jackson Pollock, Hurley, 515 U.S. at 569, from the drips on a tarp below a house painter,[9] or, for that matter, Marcel Duchamp's *Fountain* from an ordinary discarded urinal.[10]

Moreover, considering that judicial caution in labeling objects as expressive is motivated by a concern that the label of "art" may be employed as a pretextual shield from legitimate regulation, see, e.g., Mastrovincenzo, 435 F.3d at 98 ("Because merchandise that clearly has a[n] alternative, non-expressive purpose . . . is more likely . . . to have been minimally embellished for the purpose of avoiding regulation, courts should exercise greater skepticism in designating such items as 'expressive merchandise.'"), the Court finds that Plaintiff's porcelain gardens, which have stood in their present arrangement and location for nearly fifteen years, plausibly remain there mainly because Plaintiff actually intends to express a message. Plaintiff likely has neither forgotten that he left the toilets there, nor stubbornly refused to transport them to the dump; nor is it plausible under the circumstances to conclude that he is conjuring up his asserted political and artistic messages to evade the ordinance's requirement that he haul away his "junk," see Village Code § 125-5.

The porcelain gardens are, in short, protected speech, and the act of displaying them protected expression.

---

[9]   See Janet Elizabeth Haws, Comment: *Architecture as Art? Not in My Neocolonial Neighborhood: A Case for Providing First Amendment Protection to Expressive Residential Architecture*, 2005 B.Y.U.L. Rev. 1625, 1642 n.92 (2005).

[10]   See Amy Adler, *Fair Use and the Future of Art*, 91 N.Y.U.L.Rev. 559, 611 (2016) (describing the work and noting that a "poll of 500 art critics called Duchamp's *Fountain* 'the most influential work of modern art' by any artist.").

c. Is Chapter 125 Content-Based or Content-Neutral as Applied?

Having concluded that the porcelain gardens are expressive, the Court now turns to the

question of whether Chapter 125, as applied to Plaintiff, is content-based or content-neutral.

Plaintiff argues that it is a content-based regulation. The Court finds, based on the evidence

presently before it, that the law is content-neutral as applied to Plaintiff.

"As a general matter, the First Amendment means that government has no power to

restrict expression because of its message, its ideas, its subject matter, or its content." Ashcroft v.

ACLU, 535 U.S. 564, 573 (2002) (internal quotation marks and citation omitted). Content-based

restrictions encompass restrictions not only on "particular viewpoints" but also "an entire topic."

Consol. Edison Co. v. Public Serv. Comm'n, 447 U.S. 530, 537 (1980). Content-neutral

restrictions, by contrast, are those "that are justified without reference to the content of the

regulated speech." City of Renton v. Playtime Theatres, 475 U.S. 41, 48 (1986) (internal

quotation marks, emphasis and citations omitted).

To determine if a restriction is content-neutral, "the principal inquiry. . . is whether the

government has adopted a regulation of speech because of disagreement with the message it

conveys." Ward, 491 U.S. at 791. "It is the government's purpose that controls." Id. For a court

to find a content-based purpose, "[s]omething must point decisively to a motivation based on the

subject matter, or content, of the speaker's message . . . ." McTernan v. City of New York, 564

F.3d 636, 653 (3d. Cir. 2009). "Deciding whether a particular regulation is content-based or

content-neutral is not always a simple task." Turner Broad. Sys. v. FCC, 512 U.S. 622, 642

(1994).

Plaintiff presents several arguments in support of his conclusion that the instant

enforcement action is content-based, each of which the Court addresses in turn.

First, Plaintiff argues that the present application of Chapter 125 reflects a governmental preference for certain artistic media over others. Pl.'s Mem. of Law at 13 ("The Village has purported to ban lawn art if the content of that art includes repurposed toilets."). But the suppression of repurposed junk art appears to be an incidental effect of the law, whose purpose, as Plaintiff concedes, is to regulate "junk," repurposed or not. See Pl.'s Mem. of Law at 13 n.1 (describing Chapter 125 as a law legitimately prohibiting "the storage of dangerous waste"). The particular enforcement action at issue is based simply on the Potsdam government's determination that toilets placed in a publicly visible yard are "junk," and not, explicitly, on a determination that Plaintiff's porcelain gardens are the wrong sort of art. Defendants' classification of Plaintiff's porcelain gardens as statutory "junk" thus does not "reference . . . the content of the regulated speech." City of Renton, 475 U.S. at 48.

Second, Plaintiff argues that the statutory definition of "junk" as material of "little or no value," Village Code § 125-4, gives license to public officials to wield the coercive apparatus of the state on the basis of subjective judgments about the artistic quality of individual works of repurposed junk. See Pl.'s Mem. of Law at 13–16. Admittedly, since the statute lacks any definition of the term "value," there is some ambiguity regarding whether the term encompasses, on the one hand, economic or functional worth, or on the other, an open-ended concept of aesthetic merit. If the term meant the latter, the Court might be sympathetic to Plaintiff's argument that the present enforcement action is content-based. See Foti v. City of Menlo Park, 146 F.3d 629, 637 n.8 (9th Cir. 1998) (noting that "the asserted interest in aesthetics may be only a facade for content-based suppression," and that "[t]he inherent subjectivity of aesthetic

judgments makes it all too easy for the government to fashion its justification for a law in a manner that impairs the ability of a reviewing court meaningfully to make the required inquiries") (quoting Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 822 (1984) (Brennan, J., dissenting)).

But a more natural reading of the statute is that it prohibits the public display of discarded material of minimal economic or functional value. As Plaintiff appears to acknowledge in conceding that a facial challenge to the statute would be unwarranted, see Pl.'s Mem. of Law at 13 n.1, this statute by its terms regulates "junk" in general, and most of its applications are likely to items that are not even assertedly artistic. In this more common enforcement context of identifying and removing non-artistic refuse, individualized aesthetic judgments are unnecessary and out of place, rendering a reading of the statute as requiring such official determinations implausible. Moreover, while the law provides that its restrictions are motivated by aesthetic concerns, see Village Code § 125-2, the statutory scheme reflects a legislative judgment that this end is best realized through the removal of certain objectively defined categories of discarded items (including, but not limited to, toilets), and not through individualized determinations of the aesthetic value of each publicly visible discarded item in the town. If anything, the constitutional defect of Chapter 125 is in its obliviousness to art, whose value is often not economic or functional, and not in the law's tendency to empower government officials to impose subjective artistic judgments. The law's tendency to evaluate art by a rubric intended for junk, and accordingly to mandate that art be hauled away to the dump as if it is junk, would amount to an "incidental" burden on speech, characteristic of a content-neutral regulation. See Ward, 491 U.S. at 791 ("A regulation that serves purposes unrelated to the content of expression is deemed

neutral, even if it has an incidental effect on some speakers or messages but not others.").

Third, Plaintiff contends that Chapter 125 has been selectively enforced against his junk art and not other residents' junk art. Robar Aff. ¶ 11. This factual claim, if true, in theory could support a finding that the ordinance is content-based as applied to him. See, e.g., Klein v. City of Laguna Beach, 533 Fed. App'x. 772, 775 (9th Cir. 2013) (holding that the selective enforcement of a rule prohibiting sound amplification after 5 p.m. on the basis of the speaker's political message was content-based as applied). But Plaintiff has offered as evidence for this factual claim nothing more than his sworn statement that he is not personally aware of any instances in which the law has been enforced against other residents who publicly display repurposed junk. See Robar Aff. ¶ 11 ("To my knowledge, the Village has not used the Junk Ordinance against any of that art—just mine."). Plaintiff's statement based on personal knowledge is of limited probitive value, as Plaintiff, who does not claim to hold any position in local government, would not normally be aware of low-profile enforcement actions. Importantly, not every enforcement action under the ordinance requires a public hearing. See Village Code § 125-9. And even assuming, for the sake of argument, that no other enforcement actions have occurred, the Court is hesitant to label this differential treatment as selective enforcement absent information about any specific displays that have not been subject to enforcement. Accordingly, based on the evidence Plaintiff has presented at this time, the Court finds that he has not met his burden to show that the law has been selectively enforced against him.

Fourth, Plaintiff also appears to suggest that the very passage of the law was motivated by animus toward Plaintiff's art. Pl.'s Mem. of Law at 6. The passage of Chapter 125, in other words, was primarily a means to the end of wielding state power against Plaintiff specifically,

and the law's reference to various general, content-neutral public purposes is an elaborate pretext. This factual claim also, in theory, could if supported by sufficient evidence indicate that the law is content-based as applied to Plaintiff. Cf., United States v. Marcavage, 609 F.3d 264, 280–86 (3d Cir. 2010) (finding that the a demonstration permitting ordinance was unconstitutional as applied to Plaintiff, based on testimony from government officials that their decision to enforce the law against Plaintiff was motivated by concerns that his anti-abortion message disturbed pedestrians and tourists). But while it seems plausible that the authors of Chapter 125 were aware of Plaintiff's conspicuous toilet displays when they drafted the law, that Defendants were aware that the law would apply to Plaintiff's installations, and even that Defendants were content that the law would be so applied, several facts undermine the inference that a prominent purpose behind the codification of this law was to target Plaintiff.

As Defendants' emphasize, nearly fifteen years separate Plaintiff's initial creation of the art in question and the present enforcement action. Defs.' Mem. of Law at 1. And a year passed between the passage of the law and even Thompson's preliminary, informal letter notifying Plaintiff of his non-compliance with the law. Id.; Mot. Ex. H. at 3. And at that point, nearly ten years had passed since the town's last effort to compel Plaintiff to remove his toilets from his property, which seems to suggest that the town had since abandoned any prior vendetta. Robar Aff. ¶ 14. These temporal distances tend to undermine the inference that animus against Plaintiff was a prominent motivation behind either the passage of the law or its enforcement against Plaintiff.

Moreover, Defendants have adequately laundered any animus they may have harbored by passing a junk removal law whose restrictions apply to a variety of junk apart from toilets. The

29

law, for instance, contains detailed rules governing the classification of mobile homes and motor

vehicles as "junk," <u>see</u> Village Code § 125-2, which suggests that the law's drafters devoted

significant time and thought to anticipating how the law might be applied to residents other than

Plaintiff.

Accordingly, the Court finds that Plaintiff has not shown that Chapter 125 is a content-

based restriction as applied to him.

<u>d.</u> Intermediate Scrutiny

Having determined that Chapter 125 is content-neutral as applied to Plaintiff, the Court

finds that the present enforcement action does not survive intermediate scrutiny. Plaintiff appears

to concede that the city has significant interests in mitigating attractive nuisances, promoting

aesthetics, and maintaining property values. Pl.'s Mem. of law at 13 n.1. And the Court agrees.

<u>See, e.g.</u>, <u>Carminucci v. Pennelle</u>, No. 18-CV-2936, 2020 U.S. Dist. LEXIS 146937, at *43

(S.D.N.Y. Aug. 14, 2020) (noting that "[i]n the Second Circuit, both aesthetics and property

values have been demonstrated to qualify as substantial governmental interests unrelated to the

suppression of free speech," and collecting cases); <u>McCullen v. Coakley</u>, 573 U.S. 464, 486

(2014) (recognizing public safety as a significant governmental interest). But as applied to

Plaintiff, Chapter 125 neither "leaves open ample alternative avenues for communication" nor is

"narrowly tailored to serve a significant governmental interest." <u>See</u> <u>Lusk</u>, 475 F.3d at 493.

"While the First Amendment does not guarantee the right to employ every conceivable

method of communication at all times and in all places, a restriction on expressive activity may

be invalid if the remaining modes of communication are inadequate." <u>Vincent</u>, 466 U.S. at 812;

<u>City of Ladue</u>, 512 U.S. at 56 ("[E]ven regulations that do not foreclose an entire medium of

30

expression, but merely shift the time, place, or manner of its use, must leave open ample alternative channels for communication."). To be precise, it is not sufficient that some alternative avenues of expression remain; *adequate* alternatives must remain. The fact that one "is permitted to communicate his message elsewhere does not end [the] analysis if the intended message is rendered useless or is seriously burdened." Weinberg v. City of Chicago, 310 F.3d 1029, 1041 (9th Cir. 2002) (citing City of Ladue, 512 U.S. at 56–57); see also D.H.L. Assocs., Inc. v. O'Gorman, 199 F.3d 50, 59 (1st Cir. 1999) ("The essence of this question is not whether a degree of curtailment of speech exists, but rather whether the remaining communicative avenues are adequate.") (internal quotation marks omitted); Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 513 (1969) ("Freedom of expression would not truly exist if the right could be exercised only in an area that a benevolent government had provided as a safe haven for crackpots . . . we do not confine the permissible exercise of First Amendment rights to a telephone booth . . .").

An alternative is not ample if the speaker is not permitted to reach the intended audience." Berger v. City of Seattle, 569 F.3d 1029, 1049 (9th Cir. 2009) (internal quotation marks omitted); Sarre v. City of New Orleans, 420 Fed. App'x. 371, 376 (5th Cir. 2011) ("[A]n alternative forum is not sufficient if it forecloses a speaker's ability to reach one audience even if it allows the speaker to reach other groups."); see also Edwards v. City of Coeur D'Alene, 262 F.3d 856, 866–67 (9th Cir. 2001) (holding that a blanket prohibition on signs attached to supports and carried during parades on city streets failed to leave open sufficient alternative channels of communication, because alternative modes of communication would not permit the plaintiff to effectively "reach the minds of willing listeners and . . . win their attention").

As Defendants concede, while neither Chapter 125 itself nor the Board Resolution requires Plaintiff to destroy his porcelain gardens, see Defs.' Mem. of Law at 5–6, he is required, at the very least, to somehow remove all of them from public view, see id. Chapter 125 provides that the display of toilets, "regardless of quantity, is . . . prohibited within sight of persons traveling the public highways or within sight of neighboring property/properties and/or business concerns." Village Code § 125-5. In combination, these requirements seem to encompass all possible vantage points from which a member of the public might view any porcelain gardens, at least without entering the property. The Notices to Comply served upon Plaintiff state that all of the porcelain gardens "must be removed or placed so as to be in compliance with Chapter 125," i.e., out of sight of drivers and neighbors. See Notices to Comply. The Board Resolution, in arguably self-contradictory fashion, states both that the toilets must be "*fully and completely removed* from all the properties at issue," Board Resolution at 4 (emphasis added), and that "the Villages Trustees reserves the right to direct entry by the Village upon all the properties at issue to effect the removal *and/or abatement* at the expense of" Plaintiff, id. (emphasis added).

Defendants insist that the Board Resolution requires the removal of toilets from public view, as opposed to their "full[] and complete[]" removal from Plaintiff's properties, see id.; Defs.' Mem. of Law at 5–6. Even if the Court took Defendants at their word, the Court would find that the Plaintiff has met his burden to show that the enforcement of Chapter 125 likely impermissibly restricts Plaintiff's ability to communicate his intended political and artistic messages to the intended audience. Despite being installed on private property, the porcelain gardens are a form of public art, in the sense that they are publicly viewable, free of charge. Plaintiff expresses messages about politics and the aesthetic qualities of everyday objects to a

general public without a specific passion for art, in an uncontrived setting accessible to everyone.

The art thus must be casually visible, not restricted to an enclosed space that one may enter only

by appointment. See Bery, 97 F.3d at 698 ("The public display . . . of artwork is a form of

communication between artist and the public not possible in the enclosed, separated spaces of

galleries and museums."); Sarre, 420 Fed. App'x. at 377 (holding that a gallery is not an adequate

alternative to a public square, because "[t]ourists are likely to wander by historic Jackson Square

and perhaps find a piece of art that strikes their fancy, whereas only dedicated art-seeking visitors

intent on purchasing art are likely to explore the galleries of the French Quarter").[11]

---

[11]  The Court disagrees with Defendants' interpretation of the Board Resolution as requiring only the removal of the porcelain gardens from public view, as opposed to their removal from the properties. The Board Resolution does appear to include boilerplate language directing a Village official, in the event of Plaintiff's non-compliance with the order, to remove "and/or abate" the violations, as appropriate. See Board Resolution at 4. But for whatever reason, the apparent decision of the Board after a hearing in which officials assessed the unique facts of Plaintiff's case, see Village Code § 125-10, was that Plaintiff must "fully and completely remove[]" all toilets from all of his properties, rather than concealing them from public view through some less drastic means. See Board Resolution at 4.

The Court does not view this interpretive issue as determinative of the outcome of intermediate scrutiny analysis. Nevertheless, the Court notes that because the Board Resolution not only precludes the public visibility of Plaintiff's art, but also its placement anywhere on his properties, the order forecloses ample alternatives for communication for an additional reason: the Board Resolution deprives Plaintiff of alternative means of communicating his message *on his property*. See, e.g., Arlington Cnty. Republican Comm. v. Arlington Cnty., 983 F.2d 587, 595 (4th Cir. 1993) (striking down an ordinance prohibiting the placement of more than two political signs on one's property for not providing alternative avenues of expression "to the homeowner *on his property*") (emphasis in original); City of Ladue, 512 U.S. at 58 ("[A] special respect for individual liberty in the home has long been part of our culture and our law; that principle has special resonance when the government seeks to constrain a person's ability to speak there."); Schneider v. State, 308 U.S. 147, 163 (1939) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."); cf. Vincent, 466 U.S. at 812 (upholding a sign ordinance prohibiting the placement of signs on public utility poles in part because a speaker could still "exercise his right to speak and distribute literature *in the same place* where posting of signs on public property is prohibited," via other means) (emphasis added). This restriction has special significance here since Plaintiff's political message is intertwined with his installations' location on his properties.

The Court next turns to the requirement that a regulation be "narrowly tailored to serve a significant governmental interest." Lusk, 475 F.3d at 493. To be narrowly tailored under intermediate scrutiny, the statute adopted "need not be the least restrictive or least intrusive means" available. Ward, 491 U.S. at 798. The requirement is satisfied so long as the regulation "promotes a substantial government interest that would be achieved less effectively absent the regulation." Id. at 799. However, "this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary" to reach the government's desired end. Id. Moreover, the government "must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way." Turner Broad. Sys., 512 U.S. at 664.

The Court notes that the burden is on Defendants to establish that they have struck the appropriate balance in the context of this law's application to Plaintiff. See id.; Deegan v. City of Ithaca, 444 F.3d 135, 142 (2d Cir. 2006) ("In a First Amendment challenge, the government bears the burden of showing that its restriction of speech is justified under the traditional 'narrowly tailored' test."); Vincent, 466 U.S. at 803 n.22 ("The fact that the ordinance is capable of valid applications does not necessarily mean that it is valid as applied to these litigants. We may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgment of expressive activity.").

The city has significant interests in mitigating attractive nuisances, promoting aesthetics, and maintaining property values. But the Board Resolution, in mandating the removal of every last one of Plaintiff's installations entirely from public view, sweeps too broadly to be justified by an assertion of these governmental interests in abstract form. See Bery, 97 F.3d at 697

34

(acknowledging that restrictions on street vending serve important public safety objectives but concluding that in light of their incidental effect of prohibiting the sale of street art, such restrictions were "too sweeping to pass constitutional muster"); Rideout v. Gardner, 838 F.3d 65, 72 (1st Cir. 2016) ("[I]ntermediate scrutiny is not satisfied by the assertion of abstract interests."). Defendants have not presented any particularized evidence indicating, for instance, that the porcelain gardens have ever posed a risk to any child as an attractive nuisance, or that they have contributed to falling property values, despite having recently conducted a public hearing in which these factual matters presumably were explored. See Robar Aff. ¶ 19; Village Code § 125-10. Indeed, there is some reason to doubt that a display of repurposed junk art (and particularly one that has become something of a local phenomenon, see Robar Aff. ¶ 12), would have the same depressing effect on property values as a lingering pile of garbage. While the Court is willing to accept these common-sense inferences as a justification for the removal of "junk" from public view in general, the Court cannot find, in the absence of any evidentiary support, that the removal of every porcelain garden advances the asserted governmental ends more effectively than the removal or concealment of some of them. Ward, 491 U.S. at 799 (stating that time, place, or manner regulation may not "burden substantially more speech than is necessary" to reach the government's desired end).

The Court has not decided that *any* restriction on Plaintiffs' displays, whether on the quantity of porcelain gardens, or on precisely where or when they may be shown in public view, is necessarily unconstitutional. Notably, Plaintiff acknowledges that, under some circumstances, his porcelain gardens could be relocated without compromising his artistic message, see Pl.'s Mem. of Law at 21, a fact that implies some conceivable compromises between Plaintiff and the

town government. But the government order before the Court, which mandates that all of Plaintiff's porcelain gardens be removed entirely from public view, is likely unconstitutional.

### 3. *Likelihood of Success—Equal Protection Claim*

Plaintiff asserts an Equal Protection claim premised on Defendants' selective enforcement of Chapter 125. See Pl.'s Mem. of Law at 23. In order to establish an equal protection clause violation based on selective enforcement, a plaintiff must show that: "(1) compared with others similarly situated, [he or she] was selectively treated, and (2) the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations, such as race or religion, to punish or inhibit the exercise of constitutional rights, or by a malicious or bad faith intent to injure." Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995) (quoting FSK Drug Corp. v. Perales, 960 F.2d 6, 10 (2d Cir.1992)).

Plaintiff's Equal Protection claim is based solely on his sworn statement that "[t]o [his] knowledge," the Village has not enforced Chapter 125 against any other Potsdam residents who publicly display repurposed junk art. Robar Aff. ¶ 11. As the Court concluded earlier in the context of its First Amendment analysis, and for similar reasons, this sworn statement is insufficient in itself to carry Plaintiff's burden to show that he is likely to prevail on his claim. As Defendants rightly argue, Plaintiff's failure to identify any person as a comparator, let alone actually detail any comparison, inhibits the Court from ascertaining whether Plaintiff is similarly situated to people he asserts have not been subject to enforcement under Chapter 125. See Defs.' Mem. of Law at 12–13. Accordingly, Plaintiff has not demonstrated a likelihood of success with respect to his Equal Protection claim.

### 4. *Likelihood of Success—VARA Claim*

Plaintiff argues that Defendants threaten the destruction of his porcelain gardens in

violation of VARA. But Defendants do not threaten to "destroy" Plaintiff's porcelain gardens

within the meaning of the statute. Plaintiff thus has not demonstrated a likelihood of success with

respect to his VARA claim.

VARA was enacted in 1990 as an amendment to the Copyright Act, to provide for the

protection of the "moral rights" of certain visual artists. See Carter v. Helmsley-Spear, 861 F.

Supp. 303, 313 (S.D.N.Y. 1994), vacated in part, rev'd in part on other grounds, 71 F.3d 77 (2d

Cir. 1995). "Moral rights afford protection for the author's personal, non-economic interests in

receiving attribution for her work, and in preserving the work in the form in which it was created,

even after its sale or licensing." Id. (quoting Jane C. Ginsburg, *Copyright in the 101st Congress:*

*Commentary on the Visual Artists Rights Act and the Architectural Works Copyright Protection*

*Act of 1990*, 14 Colum.-VLA J.L. & Arts 477, 478 (1990)). VARA provides that the author of a

"work of visual art," "shall have the right," for life,

> (A) to prevent any intentional distortion, mutilation, or other
> modification of that work which would be prejudicial to his or her
> honor or reputation, and any intentional distortion, mutilation, or
> modification of that work is a violation of that right, and
>
> (B) to prevent any destruction of a work of recognized stature, and
> any intentional or grossly negligent destruction of that work is a
> violation of that right.

17 U.S.C. §§ 106A(a)(3), (d)(3).

Defendants mandate, at most, that Plaintiff remove the porcelain gardens from his

properties. See supra note 11. They do not order Plaintiff to destroy them, nor do they threaten to

37

do so themselves. The statutory term "destruction" appears to entail, at minimum, irreparable damage. In <u>Flack v. Friends of Queen Catherine, Inc.</u>, for instance, in which the defendant allegedly damaged the face of a 35-foot clay sculpture by placing it in a dumpster, the court found that the sculpture had not been "destroyed," because the damage was reparable. 139 F. Supp. 2d 526, 534 (S.D.N.Y. 2001); <u>see also</u> <u>Tobin v. Rector</u>, No. 12-CV-2622, 2017 WL 5466705, at *5 (S.D.N.Y. Nov. 14, 2017) (finding that a bronze sculpture of the stump and root structure of a sycamore tree was not "destroyed" when defendant broke off several of the roots in moving the sculpture). Plaintiff does not suggest that the relocation of the porcelain gardens would necessarily damage them and indeed concedes that they can be relocated. <u>See</u> Pl.'s Mem. of Law at 21 (noting that "Robar's planters are not site-specific, they can be moved and installed in various locations, and accomplish their artistic message and political protest, so long as they are publicly visible").[12] And relocation itself does not in itself constitute "destruction." <u>See, e.g.</u>, <u>English v. BFC & R E. 11th St. LLC</u>, No. 97-CV-7446, 1997 WL 746444, at *5 (S.D.N.Y. Dec. 3, 1997) (holding that the removal of plaintiff's sculptures would not violate VARA because "[r]emoving the individual sculptures does not in and of itself constitute . . . destruction"), <u>aff'd sub nom.</u>, 198 F.3d 233 (2d Cir. 1999).

Nor does relocation necessarily constitute "mutilation" under § 106A(a)(3)(A). <u>Id.</u> Relocation of a covered work of visual art does not in itself violate the statute; rather, whether removal is illegal under any category of prohibited act ("destruction," "distortion," "mutilation,"

---

[12]   Plaintiff seems to contradict this representation in his Reply, in which he asserts that "the removal of [his] porcelain planters would destroy his artistic installations, as the planters are meticulously incorporated into [his] installations." Reply at 5. At this stage, and without clarification as to how to harmonize these two statements, the Court cannot find that Plaintiff has met his burden to show that relocation would entail destruction.

or "modification") depends entirely on the consequences of relocation. See <u>Bd. of Managers of</u>

<u>Soho Int'l Arts Condo. v. City of New York</u>, No. 01-CV-1226, 2003 WL 21403333, at *10

(S.D.N.Y. June 17, 2003). The Court has been given no reason to believe that relocation of the

porcelain gardens would cause them damage of any kind. Plaintiff, in other words, "apparently

misunderstands the very point of the statute; it is not, as he seems to believe, to preserve a work

of visual art *where* it is, but rather to preserve the work *as* it is." <u>Id.</u> (emphasis in original).

Accordingly, Plaintiff has not demonstrated a likelihood of success on his VARA claim.

### 5. *The Public Interest and the Balance of the Equities*

Because Plaintiff has shown a likelihood of success on his First Amendment Claim, the

analysis of the public interest and the respective burdens on the parties is straightforward. "[I]n

the First Amendment context, . . . the likelihood of success on the merits is the dominant, if not

the dispositive, factor." <u>N.Y. Progress & Prot. PAC v. Walsh</u>, 733 F.3d 483, 488 (2d Cir.2013);

<u>see also</u> <u>Joelner v. Vill. of Wash. Park</u>, 378 F.3d 613, 620 (7th Cir. 2004) ("When a party seeks a

preliminary injunction on the basis of a potential First Amendment violation, the likelihood of

success on the merits will often be the determinative factor.") (quoting <u>Connection Distrib. Co. v.</u>

<u>Reno</u>, 154 F.3d 281, 288 (6th Cir. 1998)).

"[I]t is always in the public interest to protect First Amendment liberties." <u>Connection</u>

<u>Distrib. Co.</u>, 154 F.3d at 288 (quoting <u>G & V Lounge, Inc. v. Mich. Liquor Control Comm'n</u>, 23

F.3d 1071, 1079 (6th Cir.1994)); <u>see also</u> <u>Walsh</u>, 733 F.3d at 488 ("[S]ecuring First Amendment

rights is in the public interest."); <u>Homans v. Albuquerque</u>, 264 F.3d 1240, 1244 (10th Cir. 2001)

("Having determined that Mr. Homans has demonstrated a substantial likelihood of success on

the merits, we believe that the public interest is better served by . . . protecting the core First

Amendment right of political expression."); Newsom v. Albemarle County Sch. Bd., 354 F.3d 249, 261 (4th Cir.2003) ("Surely, upholding constitutional rights serves the public interest.").

Normally, the Court would assume that the interests of the government are aligned with the public interest, but that is not so when the government violates an individual's First Amendment rights. See Deferio v. City of Syracuse, 193 F. Supp. 3d 119, 131 (N.D.N.Y. 2016) (Kahn, J.). Plaintiff's interests align with those of the people of Potsdam, because "[t]he constitutional guarantee of free speech serves significant societal interests wholly apart from the speaker's interest in self-expression." Pacific Gas and Elec. Co. v. Public Utilities Comm'n of California, 475 U.S. 1, 8 (1986) (internal quotation marks and citations omitted). "By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information." Id.

For similar reasons, the balance of the equities favors Plaintiff as well. See, e.g., Invisible Empire Knights of Ku Klux Klan v. City of W. Haven, 600 F. Supp. 1427, 1436 (D. Conn. 1985) ("[T]he balancing of the plaintiffs' interest in free speech against the city's interest in being able to enforce an unconstitutional ordinance clearly establishes that the equities tilt decidedly in favor of the plaintiffs."). Plaintiff faces a significant hardship, namely, surrendering his right to political and artistic expression via his porcelain gardens. See, e.g., Deferio, 193 F. Supp. 3d at 130–31 (describing the loss of the right to demonstrate as a "substantial" hardship); Walsh, 733 F.3d at 488 (describing impermissible restrictions on political speech as a "significant" hardship to the plaintiff). The Government, on the other hand, "does not have an interest in the enforcement of an unconstitutional law." Walsh, 733 F.3d at 488 (quoting ACLU v. Ashcroft, 322 F.3d 240, 247 (3d Cir.2003)). And Defendants's burden is especially light here, given that

40

the Court only enjoins the law as applied to Plaintiff in this instance, and Defendants' power to pursue the legitimate governmental ends served by the general statutory scheme is otherwise left intact. Cf. Deferio, 193 F. Supp. 3d at 131 (noting that "the hardship imposed on Defendants is relatively minimal, since all the requested injunction requires is for them not to ban Plaintiff from the area on the basis of one policy that the Court has determined likely to be unconstitutional").

Accordingly, the public interest and balance of the equities favor a preliminary injunction.

### C. Declaratory Relief

Plaintiff seeks a declaration that the porcelain gardens are not "junk" as defined in Chapter 125. See Pl.'s Mem. of Law at 22–23; Village Code § 125-4 (defining "junk" as "[w]orn out or discarded material of little or no value, including, but not limited to, junk appliances . . ."). For reasons largely already discussed, the Court disagrees with this interpretation of the ordinance and accordingly denies Plaintiff's request for declaratory relief.

First, Plaintiff argues that the porcelain gardens are not "junk," because they are not "worn out or discarded material," but rather have been intentionally placed. Pl.'s Mem. of Law at 22. But the law plainly specifies that the porcelain gardens are included within this category, by stating that "junk" "includ[es], but [is] not limited to, junk appliances," defining "junk appliances" to include "bathroom fixtures," and defining "bathroom fixtures" to include "toilets." Village Code § 125-4. For purposes of First Amendment analysis, Plaintiff's point that his porcelain gardens are more than mere toilets, but rather are toilets intentionally altered and arranged to communicate political and artistic messages, is well-taken. But Chapter 125 is constitutionally defective precisely in failing to take this into account. See supra Part B(2)(d).

41

Second, Plaintiff argues that the porcelain gardens are not "of little or no value," because they have artistic value. Pl.'s Mem. of Law at 22. But as discussed, the Court construes this statutory phrase to refer to economic or functional value. See supra Part B(2)(c).

Third, Plaintiff argues that the porcelain gardens are not "junk appliances," because the removal of their functional components has transformed them into non-toilets. Pl.'s Mem. of Law at 22. The Court respectfully disagrees: the porcelain gardens are toilets, albeit ones brimming with constitutionally protected expression.

## IV.    CONCLUSION

Accordingly, it is hereby:

**ORDERED**, that Plaintiff's motion for a preliminary injunction (Dkt. No. 5) is **GRANTED**; and it is further

**ORDERED**, that Defendants are hereby enjoined and restrained, until further order of the Court, from enforcing the Board Resolution; and it is further

**ORDERED**, that Plaintiff's request for declaratory relief is **DENIED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

DATED:        September 21, 2020
              Albany, New York


Lawrence E. Kahn
U.S. District Judge

42